## IN THE UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| WHITNEY POWELL, | ) | Civil Division |
| | ) | |
| Plaintiff, | ) | No.      20-1792 |
| v. | ) | |
| | ) | |
| KINDERCARE EDUCATION LLC f/k/a | ) | |
| KNOWLEDGE UNIVERSE | ) | **JURY TRIAL DEMANDED** |
| EDUCATION LLC d/b/a KIDERCARE | ) | |
| LEARNING CENTER | ) | |
| | ) | |
| Defendant. | | |

## COMPLAINT

AND NOW COMES Plaintiff Whitney Powell ("Plaintiff" or "Ms. Powell"), by and through her undersigned counsel, and brings this Complaint seeking legal and equitable relief for unlawful racial discrimination, harassment, retaliation, hostile work environment, and wrongful termination against KinderCare Education LLC f/k/a  Knowledge Universe Education LLC d/b/a KinderCare Learning Center("KinderCare," the "Company" or "Defendant") in violation of Title VII of the Civil Rights Act of 1964 ("Title VII") as well as pendent state law claims arising under the provisions of the laws of this Commonwealth including the Pennsylvania Human Relations Act, 42 P.S. § 951, *et seq.* (hereinafter referred to as "PHRA"), stating as follows:

### JURISDICTION AND VENUE

1.        Jurisdiction is invoked pursuant to 28 U.S.C. §§ 1331, 1332 and 1391.  This action is authorized and instituted pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.* ("Title VII") and the Pennsylvania Human Relations Act, 42 P.S. § 951, *et seq.* (hereinafter referred to as "PHRA").

2.        The unlawful employment practices and harassment were committed by the Defendant in Allegheny County, Pennsylvania, where Ms. Powell worked for Defendant as a

teacher. Therefore, the United States District Court for the Western District of Pennsylvania is the proper venue for the action under 42 U.S.C. § 2000e-5(f) and 28 U.S.C. §1391(b).

3.      Ms. Powell timely exhausted her administrative remedies by filing a charge against the County with the United States Equal Employment Opportunity Commission ("EEOC") at Charge No. 533-2019-02038. Plaintiff's Charge was dual filed with the Pennsylvania Human Relations Commission and is incorporated by reference as if fully set forth herein. On August 25, 2020, the EEOC mailed Plaintiff a Dismissal and Notice of Rights letter (the "Right to Sue" letter) advising her of the right to bring this action. Plaintiff has filed the instant suit within 90 days of receipt of the Right to Sue letter.

4.      Defendant is an employer within the meaning of Title VII and the PHRA.

### PARTIES

5.      Ms. Powell is a 32-year-old African American female individual who resides at 647 5th Street, Pitcairn, Pennsylvania, 15140.

6.      KinderCare Education LLC, formerly known as Knowledge Universe Education LLC is a Delaware limited liability company, authorized to do business in the state of Pennsylvania. KinderCare Education LLC owns and operates KinderCare Learning Center, located at 2630 Pitcairn Road, Monroeville, Pennsylvania 15146.

### FACTS

7.      Plaintiff incorporates by reference the allegations contained in the foregoing paragraphs as though fully set forth herein at length.

8.      Ms. Powell was hired as a co-teacher/pre-school classroom teacher by KinderCare on or about July 30, 2018.

9.      During her time with KinderCare, Ms. Powell never had a single complaint or so much as a verbal reprimand regarding her conduct or behavior while caring for any of the children.

10.     Throughout the course of her employment, Ms. Powell was subjected to various unwelcome comments and microaggressions regarding her race.  She witnessed favoritism towards Caucasian employees, discrimination, racial bias and retaliation.

11.     In or around February of 2019, a KinderCare cook, Ray Sims made racially inappropriate comments regarding Ms. Powell's afro hair style stating, *"what in the world is wrong with your hair?"* and *"why do you have me working with these people?"* to a supervisors Christine Hines (Director) and Kris Kush (Assistant Director) in reference to Ms. Powell.

12.     These comments were made in the front office with management present, and management failed to interject or discipline Mr. Sims for creating a hostile work environment for Ms. Powell.

13.     Immediately thereafter, Ms. Powell complained to Director, Christine Hines, about the embarrassment suffered by her in response to these comments.

14.     Ms. Hines indicated that she would "*take care of it*."

15.     Upon information and belief, Mr. Sims suffered no corrective action and was never spoken to or disciplined as a result of Ms. Powell's complaint.

16.     Mr. Sims harassment and the hostile work environment to which Ms. Powell was subjected continued.  In or around March of 2019, Mr. Sims made another racist comment to Ms. Powell regarding her lunch and it being "*poor Black people food*."

17.     Ms. Powell, again, had a conversation with Christine Hines referencing Mr. Sims' inappropriate comments and the hostile work environment he was creating for her and other African American teachers, and, again, Ms. Hines indicated she would *"take care of it."*

18.     Once more, Ms. Powell believes Mr. Sims suffered no corrective action and was never spoken to or disciplined as a result of Ms. Powell's complaint.

19.     In or around May of 2019, one of Ms. Powell's co-employees, Angelica Starks, approached her and Terri Hogan (another African-American teacher) at KinderCare regarding her concern that cook Ray Sims was making racial jokes and innuendos about what Black people eat, suggesting they eat fried chicken and watermelon.

20.     Ray Sims was making comments such as Black people eat poor-man meals like ramen noodles in the presence of six Caucasian teachers (including administrators like Kris Kush, Assistant Director) who allowed and perpetuated Ray Sims' racially insensitive and illegal comments.

21.     Ms. Hogan questioned why no one said anything to the inappropriate racial comments.

22.     Ms. Kush and Ms. Hines ignored Ms. Hogan and Vicki Fritz (Program Director) responded stating that she told Ray she likes chicken and watermelon too and she is white.

23.     No corrective action was taken against Ray Sims despite this not being the first racist remark from Ray Sims about African American teachers at the Center that was reported to the Center's administrators.

24.     Center Administrators justified their inactions because Mr. Sims is also a person of color.

25.     Ms. Powell again addressed the issue with Christine Hines on or about May 22, 2019.

26.     Ms. Hines asked if Ray Sims apologized to Ms. Powell for making the comment.

27.     Ms. Powell responded, "no he did not," and, again, Ms. Hines nor any other supervisor at KinderCare disciplined Ray Sims for the hostile comment.

28.     On July 9, 2019, Ms. Powell attended a Roundtable in Bridgeville where President, Michael Canevin, was present.  Ms. Powell spoke, and Mr. Canevin commended her comments and her presentation.  He said, *"you should be on the road with us doing these meetings."*  He further expressed his interest in becoming her mentor and provided her with his business card, telling her to reach out anytime she had an issue.

29.     In the few days thereafter, Mr. Canevin visited the Monroeville KinderCare Center. Mr. Canevin met with Ms. Powell and Ms. Hogan and they shared their experiences with him.  Mr. Canevin said to keep him in check with what is going on and to reach out to him any time.

30.     The following week, Ms. Powell took him up on his offer and reached out to him to discuss the hostile work environment more specifically at the Center.  Mr. Canevin advised Ms. Powell that he would discuss the matter with Melissa Fonda and would get back to her.

31.     Mr. Canevin never got back to Ms. Powell.

32.     KinderCare administration began perpetuating rumors that Ms. Powell and Ms. Hogan were "bullying" Caucasian teachers.

33.     On August 14, 2019, Rochella Anderson, an African American infant teacher, brought it to Ms. Powell and Ms. Hogan's attention that it was being said around the building that we were bullying white teachers, especially Ms. Musser, their co-teacher.

34.     On August 15, 2019, Ms. Powell and Ms. Hogan decided it would be best to involve Human Resources, in an effort to follow Company protocol in dealing with their complaints of discrimination/hostile work environment, since Center management was unwilling to resolve the issues, and they were being portrayed in a negative light for standing up against racism.

35.     Ms. Powell called the front office and asked Assistant Director, Kris Kush, for the telephone number to Human Resources.

36.     Ms. Kush provided a post-it note that contained a telephone number on it.  *See* Exhibit A.

37.     When Ms. Hogan and Ms. Powell called the number provided by Ms. Kush, they discovered it was <u>not</u> KinderCare Human Resources, and that she had intentionally provided them with a false telephone number in an effort to prevent them from reporting the discrimination/hostile work environment that was occurring at the Center.

38.     Ms. Powell immediately telephoned Ms. Kush, again, to inform her she had provided them with an incorrect telephone number.

39.     In response, Ms. Kush told Ms. Hogan and Ms. Powell that she would provide the correct telephone number.

40.     Ms. Kush returned to the preschool room approximately ten minutes later and told Ms. Powell that Christine Hines (Director) would like to speak to her on the phone.  Also present on the phone was District Leader, Melissa Fonda.

41.     Ms. Powell informed Ms. Hines, Ms. Fonda and Ms. Kush about all of the issues she and Ms. Hogan planned to discuss with Human Resources including, but not limited to, Ray Sims' inappropriate, racially insensitive comments; Administration's refusal to discipline or correct Ray's illegal behaviors; and the rumors started by Caucasian employees that they were being bullied by the African American teachers at the Center.

42.     Ms. Fonda specifically instructed Ms. Powell that she and Ms. Hogan must <u>not</u> call Human Resources.  Ms. Hines instructed Ms. Powell to give Ms. Hogan a hug and to tell her it would all be okay.

43.     The telephone number for HR was <u>not</u> provided.

44.     Also, on August 15, 2019, Angela Starks, another African American teacher, came to Ms. Powell's classroom and told her and Ms. Hogan that her mother, Tawney Campbell, is an African American Director at another KinderCare Learning Center who was subjected to discrimination as a Black woman at KinderCare by co-workers and parents and suggested that the two speak with her mother.

45.     It became evident that Ms. Powell's complaints were not being kept confidential because Ms. Starks was aware of the situation.

46.     Ms. Powell and Ms. Hogan contacted Ms. Campbell that morning and advised her of the contact that she had with Ms. Hines and Ms. Fonda.

47.     Ms. Campbell, who is a Director, believed Ms. Powell and Ms. Hogan were being subjected to a hostile work environment and provided them with advice.

48.     Ms. Campbell advised Ms. Powell to "*make sure you document all conversations get a notebook and put dates and times*" and suggested *"words to use if [management doesn't] take care of this"* which were *"I don't feel comfortable working in a hostile environment and feel that I am being attacked based on the color of my skin*."

49.     On August 16, 2019, Ms. Powell was called into the office for a meeting by Ms. Hines and was falsely accused of not feeding a child and forcing him to stay on his cot from 11:00 AM to 3:00 PM.  The alleged neglect occurred on **August 8, 2019—yet, the report was not made until August 16, 2019, the day after Ms. Powell and Ms. Hogan attempted to formalize their complaints of discrimination/hostile work environment with Human Resources.**

50.     Not coincidentally, Ms. Hogan was accused of the same conduct.

51.     The date of August 8, 2019 is also significant because Sarah Musser, who was assigned to the same classroom as Ms. Hogan and Ms. Powell, was on vacation, leaving no one to verify the veracity of the allegations.

52.     KinderCare failed to ask Ms. Powell or Ms. Hogan any questions regarding the false accusation and placed them on unpaid leave, despite having Jamie Tribassi present as a claimed "impartial" investigator for a meeting that lasted fewer than ten (10) minutes.

53.     Ms. Powell was then escorted from the building with her children (who attended KinderCare), in an effort to publicly humiliate her.

54.     Ms. Hogan and Ms. Powell attempted to contact Human Resources on August 19, 2019 and August 22, 2019 in an attempt to oppose the decision to place them on administrative leave as a result of a false accusation.

55.     They further filed a complaint with Mason Wong (Human Resources) and the Ethics department regarding the hostile work environment, discrimination, harassment, slander and now retaliation that they were facing.

56.     KinderCare later attempted to schedule interviews of Ms. Powell and Ms. Hogan, which were initially set for August 27, 2020.

57.     Ms. Powell also contacted Michael Canevin, President, on behalf of both women, who, again, never responded.

58.     Ms. Powell and Ms. Hogan requested to bring legal representation, given the serious accusations made against them, and on August 27, 2020, they were informed that it was against KinderCare's policy to allow them to have legal representation at the meeting.

59.     Ms. Powell and Ms. Hogan requested to reschedule the meeting so that they at least had an opportunity to meet with a lawyer to prepare for the meeting.  Ms. Fonda approved this request.

60.     Thereafter, Ms. Powell and Ms. Hogan repeatedly attempted to reschedule their meeting.  Despite their attempts, KinderCare advised they needed to make their decision quickly and terminated both Ms. Powell and Ms. Hogan on or about August 28, 2019.

61.     KinderCare further advised both women that they needed to find substitute care for their children, who were no longer welcome to attend the Center.

62.     KinderCare is subject to state-mandated legal licensing requirements and state oversight.  Specifically, Pennsylvania law prohibits childcare centers from singling out a child for ridicule.  *See* PA Child Care Code 3270.113(c).  The state further has a mandatory reporting requirement for such behavior.

63.     The employee who made the report on August 16, 2019 was Angelica Starks.

64.     If the accusations of child neglect were correct, Ms. Starks would have a mandatory obligation to have made a report to the state—which she did not—calling into question her credibility.

65.     Ms. Starks also did not advise her supervisor of the alleged neglect until eight (8) days after it allegedly occurred.

66.     Ms. Starks also had an affirmative obligation to protect the child pursuant to KinderCare policies such as OP-300 and OP-250 and intervene in the situation, feeding the child and removing him from the situation.

67.     Oddly, Ms. Starks was not disciplined for her complacency in failing to report the alleged neglect.

68.     Ms. Starks contradicted herself multiple times during KinderCare's "investigation."

69.     Impossibilities were contained in Ms. Starks statement.  For example, Ms. Powell, Ms. Hogan and all their students were outside at a watermelon event during a portion of the timeframe Ms. Starks claimed the child was confined to his cot.

70.     Statements were not produced from the other many employees working at the Center that day, who would have witnessed the claimed neglect had it actually occurred, including two individuals who work in a finance office connected to the classroom where the alleged neglect occurred.

71.     Ms. Hogan also spoke to the child-at-issue's mother following the incident who was instructed by Ms. Hines to ask the child if the claimed conduct happened.  The child responded "*no, mommy.  That didn't happen.  My teachers always feed me.*"  The mother also commented in response to the allegation that the child was forced to sit on his cot from 11-3 as follows: "*11-3. Damn cant a soul in this world get my child to sit anywhere from 11-3*".

72.     Nonetheless, KinderCare still reached its conclusion that Ms. Powell and Ms. Hogan should be terminated as a result of the unsubstantiated allegations made against them.

73.     The claimed child neglect was the pretextual reason given for Ms. Powell's termination to hide the discriminatory and retaliatory conduct of the Center.

74.     Further, several Caucasian employees have violated similar policies and procedures which would trigger the state mandated reporting requirement and were not terminated, evidencing the disparate treatment of Black employees.  For example:

    a.  In or around the fall of 2019, Kris Kush (Caucasian) reportedly taped a child's clothes onto her body after the child repeatedly took her clothes off.  The child

complained that she was hurt by the teacher.  Because Ms. Kush was a supervisor, no report was made and Ms. Kush was not disciplined.

b.  In or around July 2019, another Caucasian teacher Lisa (last name unknown) pulled a child's arm from his socket.  To make this incident even more egregious, Ms. Hogan previously reported to Ms. Hines that she witnessed Lisa on the playground abusing the same child.  During this incident, Lisa was also pulling the child's arm in an aggressive fashion.  Had KinderCare intervened after Ms. Hogan's complaint, this never would have occurred.  Upon information and belief, this teacher was offered a position in the school age classroom, which she declined and resigned.

c.  A Caucasian teacher Sarah Musser forgot a special needs child on the playground on or around July 30, 2018.  Upon discovery that the child was left at recess, Ms. Musser broke teacher to child ratio to search for the missing child, who was found by her on the jungle gym.  When she reported the incident to Ms. Kush, Ms. Kush told Ms. Musser to calm down and that she would "*take care of it*."  The two came up with a "story" to tell the child's mother to cover-up the incident—claiming that the child "ran away" from the building.  Upon information and belief, Ms. Musser was not reprimanded or disciplined as a result of this incident.

d.  In or around 2018, Sarah Musser placed a stink bug in a cup and sat it next to a little girl's bed to force her to stay in her cot at nap time.  Another teacher reported the incident to Christine Hines.  Upon information and belief, no incident report was completed, and no state report was filed.  Ms. Musser was not disciplined or reprimanded for these actions.

e.  In or around Fall of 2018, three Caucasian teachers were supervising the child of a former African American employee of KinderCare.  The child split his head open at approximately 3:30 PM-4:00 PM.  Protocol was not followed, and the parent was not immediately notified.  The incident required the child to get stitches.  The teachers were unable to consistently articulate to the parent what occurred.  Upon information and belief, no investigation occurred; the three teachers were not disciplined; and this incident was not reported to the state.

75.  Yet, KinderCare terminated Ms. Powell based upon an unsubstantiated allegation from in uncredible source.

76.  Plaintiff is in a protected class under Title VII and the PHRA at the time the acts of discrimination, retaliation, hostile work environment and wrongful termination occurred.

77.  This conduct has caused Ms. Powell irreparable harm and humiliation.

78.  At all relevant times hereto, KinderCare acted or failed to act by and through its duly authorized agents, servants, and employees, who conducted themselves within the scope and course of their employment.

## COUNT I
## TITLE VII DISCRIMINATION and RETALIATION

79.  Plaintiff incorporates by reference the allegations contained in the foregoing paragraphs as though fully set forth herein at length.

80.  The foregoing conduct, including the specific targeting of Ms. Powell, along with other adverse actions directed at Ms. Powell because of her race and for opposing racial discrimination, constitutes unlawful discrimination and retaliation against Ms. Powell.

81.  At all times relevant, Defendant was an "employer" within the meaning of Section 701(b) of Title VII.

82.     Ms. Powell was subjected to a hostile work environment and was intentionally discriminated and retaliated against because of her race, in violation of Title VII.

83.     Defendant knew or should have known about the discriminatory conduct and harassment to which Ms. Powell was subjected and failed to take appropriate remedial action.

84.     Defendant's failure to maintain a workplace free of harassment and a failure to take prompt remedial action to address the hostile work environment and racial discrimination to which Plaintiff was subjected was intentional, malicious and in reckless indifference to Ms. Powell's protected federal and state rights.

85.     As a result of Defendant's unlawful discrimination, Ms. Powell has suffered damages as set forth herein.

86.     Defendant's unlawful treatment of Ms. Powell based on her race and in retaliation for opposing racial discrimination as well the Company's more favorable treatment of white employees constitutes conduct and employment practices made illegal under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e-2(a)(1), and the Pennsylvania Human Relations Act.

87.     Defendant's conduct described above had the purpose and effect of depriving Ms. Powell of the rights enjoyed by individuals outside her protected class and, therefore, was in violation of Title VII and the PHRA.

88.     Defendant fired Ms. Powell because she opposed conduct made illegal under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e-2(a)(1), and therefore violated 42 U.S.C. §2000e-3(a).

89.     As a direct and proximate result of the discrimination, disparate treatment, harassment, retaliation, hostile work environment and wrongful termination which Ms. Powell suffered while employed by Defendant, Ms. Powell has suffered not only tangible economic loss

in the form of lost back pay and benefits and potential lost front pay and benefits, but also substantial emotional and physical distress, embarrassment and humiliation, and pain and suffering, and is entitled to compensatory damages for these injuries, in addition to the tangible economic losses she has suffered and will continue to suffer.

WHEREFORE, Plaintiff seeks the damages set forth in the *ad damnum* clause of this Complaint, *infra.*

### COUNT II
### PHRA – DISCRIMINATION, RETALIATION and HOSTILE WORK ENVIRONMENT

90.     Plaintiff incorporates by reference the allegations contained in the foregoing paragraphs as though fully set forth herein at length.

91.     This is an action arising under the provisions of the laws of the PHRA and this Honorable Court has, and should, exercise pendent jurisdiction over the same because the cause of action set forth in this COUNT II arises out of the same facts, events and circumstances as in the above COUNT, and therefore judicial economy and fairness dictate that this COUNT II be brought in this same Complaint.

92.     At all times relevant, Defendant was an "employer" within the meaning of Section 954(b) of the PHRA.

93.     By engaging in the creation and fostering of a discriminatory, retaliatory and hostile work environment and by wrongfully terminating Ms. Powell, Defendant violated Section 955(a) of the PHRA which prohibits discrimination and harassment based upon race with regard to the continuation and tenure of employment.

94.     Ms. Powell was subjected to a hostile work environment and was intentionally discriminated against because of her race, in violation of the PHRA.

95.     Defendant's failure to maintain a workplace free of harassment and a failure to take prompt remedial action to address the hostile work environment, discrimination and retaliation to which Ms. Powell was subjected was intentional, malicious and in reckless indifference to her protected state rights.

96.     Ms. Powell engaged in a protected activity as described by Section 955(d) of the PHRA.

97.     Defendant's retaliatory conduct towards Ms. Powell as a result of her engaging in protected activities remains a violation of the PHRA.

98.     Defendant's retaliatory conduct toward Ms. Powell was intentional, malicious and in reckless indifference to her protected state rights.

99.     As a direct and proximate result of the discrimination, disparate treatment, harassment, retaliation, hostile work environment and wrongful termination which Ms. Powell suffered while employed by Defendant, Ms. Powell has suffered not only tangible economic loss in the form of lost back pay and benefits and potential lost front pay and benefits, but also substantial emotional and physical distress, embarrassment and humiliation, and pain and suffering, and is entitled to compensatory damages for these injuries, in addition to the tangible economic losses she has suffered and will continue to suffer.

100.    WHEREFORE, Plaintiff seeks the damages, including punitive damages under the PHRA, set forth in the ad damnum clause of this Complaint, infra.

## PRAYER FOR RELIEF and DEMAND FOR JURY

WHEREFORE, Ms. Powell demands judgment against Defendants, and damages in excess of $75,000 as follows:

a.  That Ms. Powell be awarded actual, consequential, compensatory and punitive damages to make her whole including back pay with prejudgment interest, front pay

and compensation for lost benefits, in an amount to be proven at trial, and other affirmative relief necessary to eradicate the effects of Ms. Powell' damages associated with Defendant's discrimination, retaliation, harassment, hostile treatment and wrongful termination of her pursuant to Title VII and the PHRA and corresponding state law claims, plus interest;

b.  That Ms. Powell be awarded compensatory damages to compensate for all costs associated with the discrimination, retaliation, harassment, hostile work environment and wrongful termination including lost wages and any medical expenses;

c.  That Ms. Powell be awarded nominal damages;

d.  That Ms. Powell be awarded punitive damages in an amount sufficient to punish Defendant for its intentional, wanton and malicious conduct and to deter similar misconduct;

e.  That Ms. Powell be awarded the costs of this litigation, including reasonable attorney's fees;

f.  That the Court enter a judgment declaring Defendant's actions to be unlawful and in violation of Title VII;

g.  That Defendant be ordered to reinstate Ms. Powell and provide her accumulated seniority, fringe benefits and all other rights;

h.  That the Court enter a judgment declaring Defendant's actions to be unlawful and in violation of the Pennsylvania Human Relations Act;

i.  That the Court award Ms. Powell compensatory damages as a result of Defendant's violations of the Pennsylvania Human Relations Act;

j.  That Defendant be enjoined from discriminating against Ms. Powell in any manner that violates the Pennsylvania Human Relations Act;

k.  An award of prejudgment interest; and

l.  That Ms. Powell be awarded such further relief as deemed to be just and proper.

Case 2:20-cv-01092-RJC Document 31 Filed 11/18/20 Page 17 of 17

Date:   11/18/2020                    Respectfully Submitted,

                                      _/s/ Stephanie L. Solomon_____
                                      Stephanie L. Solomon, Esquire
                                      Pa. I.D. 208056
                                      HKM EMPLOYMENT ATTORNEYS LLP
                                      220 Grant Street
                                      Suite 401
                                      Pittsburgh, PA  15219
                                      412.760.7802
                                      ssolomon@hkm.com